**Exhibit 83**



1  ARTURO J. GONZALEZ (BAR NO. 121490)
    (AGonzalez@mofo.com)
2  MIRIAM A. VOGEL (BAR NO. 67822)
    (MVogel@mofo.com)
3  SUZANNA P. BRICKMAN (BAR NO. 250891)
    (SBrickman@mofo.com)
4  MORRISON & FOERSTER LLP
    425 Market Street
5  San Francisco, California  94105-2482
    Telephone:   415.268.7000
6  Facsimile:    415.268.7522

7  Attorneys for Petitioner
    BULLIS CHARTER SCHOOL
8

**(ENDORSED)
FILED**

OCT 1 8 2013

DAVID H. YAMASAKI
Chief Executive Officer/Clerk
Superior Court of CA County of Santa Clara
BY_____
DEPUTY

9        SUPERIOR COURT OF THE STATE OF CALIFORNIA

10          FOR THE COUNTY OF SANTA CLARA

11

12  BULLIS CHARTER SCHOOL,          **CASE NO. 109CV144569**

13          Petitioner,          **SUPPLEMENTAL
                                          DECLARATION OF ARTURO J.
14        v.                    GONZÁLEZ IN SUPPORT OF
                                          BULLIS CHARTER SCHOOL'S
15  LOS ALTOS SCHOOL DISTRICT; BOARD OF   **MOTION FOR ATTORNEYS'
    TRUSTEES OF THE LOS ALTOS SCHOOL      FEES**
16  DISTRICT; and TIM JUSTUS, in his capacity as
    District Superintendent,               Date:   December 12, 2013
17                                   Time:  9:00 a.m.
            Respondents.          Dept:  5
18
                                   The Honorable Carol Overton
19
                                   Petition Filed: June 10, 2009
20

21

22

23

24

25

26

27

28

1    I, Arturo J. González, declare as follows:

2         1.      I am Co-Chair of the Litigation Department at Morrison & Foerster LLP, counsel

3    for Petitioner Bullis Charter School in this action. I am licensed to practice law in the United

4    States Supreme Court, the United States Court of Appeals for the Ninth Circuit, and all state and

5    federal courts in California. I have personal knowledge of the facts stated herein and could testify

6    competently to them if called upon to do so.

7         2.      This declaration supplements my declaration filed on August 10, 2012 (Dkt. No.

8    190). Like this declaration, my August 10, 2012 declaration was filed in support of Bullis'

9    Motion for Attorneys' Fees under section 1021.5 of the Code of Civil Procedure (Dkt. No. 189).

10   Although the motion – and Bullis' supporting memorandum – was filed over a year ago, the

11   parties have not yet completing briefing. This updates my August 10, 2012 declaration, and, as

12   discussed below, attaches legal bills since August 2012 for our work responding to the District's

13   substantial discovery that the District claims was necessary to respond to Bullis' motion for legal

14   fees. Together with this declaration, we are filing an amended notice of our motion as well as a

15   supplemental Declaration of Jed Wallace (Mr. Wallace also filed a declaration on August 10,

16   2012 (Dkt No. 191)). Because our memorandum of points and authorities (Dkt. No. 190) has not

17   changed, we rely on our August 10, 2012 filing.[1]

18        3.      Bullis Charter School ("Bullis") retained Morrison & Foerster in 2008, when it

19   was sued (as real party in interest) by the Los Altos School District (the "District") regarding its

20   County-approved admissions policy. Bullis prevailed. I have represented Bullis since, and began

21   work as lead counsel on this engagement in early 2009.

22                                    **LEGAL EXPERIENCE**

23        4.      In evaluating a fee request, one of the things courts consider is the experience and

24   background of the lawyers who did the work. I am a trial lawyer. I graduated from Harvard Law

25   School in 1985, began working as an associate at Morrison & Foerster in September of 1985, and

26   _____

27   [1] We note that the citations to the González Declaration in Bullis' memorandum refer to
     my original, August 10, 2012, declaration.

28

                                              1

became a partner in 1992. I am an Associate with the American Board of Trial Advocates, an organization that requires the equivalent of 20 civil jury trials for consideration. I have successfully defended three trials where my client was a defendant sued in each case for more than $1 billion. I have also obtained four verdicts for plaintiffs that were each in excess of $10 million. I have tried cases in a variety of complex substantive areas, including seven civil rights cases to verdict and cases involving trade secrets, the Lanham Act, copyright, fraud, contract disputes, unfair business practices, legal and medical malpractice, race and sex discrimination, tax matters, and criminal law.

5.      I have worked on many matters affecting the public interest and public education throughout my career, including *Butt v. State of California* (1992) 4 Cal.4th 668, one of California's most important public school decisions, which I argued in the California Supreme Court. That case held that a premature closure of public schools would violate a child's fundamental right to a public education. I served as lead counsel for plaintiffs, representing public school parents and their children who resided in the district.

6.      I also have significant appellate experience. I have argued cases before the California Supreme Court, the First, Third, and Sixth District California Courts of Appeal, and the Ninth Circuit.

7.      I have received a number of awards and acknowledgements for my legal work. In 2009, I was recognized by the *National Law Journal's* "Winning" Special Report as one of the top 10 trial lawyers in the United States. From 2010-2013, I was selected as one of the country's top trial lawyers by *Legal 500 US*, which described me as "incredibly impressive on his feet" and "a great leader." From 2006-2012, I was named by the *California Daily Journal* as one of California's Top 100 leading lawyers, and was recommended as a leading lawyer by *Best Lawyers in America* in 2011 and 2012. In 2008, I was selected by *The National Law Journal* among the "50 Most Influential Minority Lawyers in America," by *Hispanic Business* as one of the 100 most influential Latinos in the United States, and by *Lawdragon* as one of the 500 Leading Lawyers in America. In 2003, the *American Lawyer* magazine selected me as one of the nation's top 45 lawyers under the age of 45, and in 1995, the *National Law Journal* selected me

2

1  as one of the nation's top 40 lawyers under the age of 40.  In addition, in 1991, *California Law*

2  *Business* selected me as one of the top 20 young lawyers in California.  I have also been named as

3  a leading litigation attorney in California by *Chambers USA*.

4         8.    I have served as Co-Chair of Morrison & Foerster's Litigation Department since

5  2010; prior to assuming that role, I served as Chair of the firm's Trial Practice Group.  In these

6  roles, and during the course of my 28-year legal career, I have been active in teaching other

7  lawyers.  I have chaired panel presentations on behalf of the Practicing Law Institute ("PLI") and

8  have served on more than twenty panels for the California Continuing Education of the Bar

9  ("CEB") in different substantive areas.  This past August, I was Chairperson for a new PLI

10  Program on trial skills entitled "California Trial Advocacy."  I moderated one of the panels,

11  entitled "Preparing Your Case for Trial."  I have served on six panels on The Effective Delivery

12  of Opening Statements and Closing Arguments (and was moderator for two of those panels), and

13  have also served on panels regarding preparing cases for trial, motion practice, recent

14  developments in the law, expert witnesses, courtroom technology, and discovery issues.  I have

15  also made a presentation on professional malpractice, and have taught lawyers the effective way

16  to take depositions.  I have lectured to over 3,000 lawyers throughout California.  In addition, I

17  have made a presentation to lawyers in Puerto Rico on trial preparation, including the effective

18  use of videotaped depositions at trial.

19         9.    I am also active in bar activities.  In 2010, I served as the President of the Bar

20  Association of San Francisco.

21       10.    I have received awards for my legal work from a number of organizations,

22  including the Alameda County Board of Education, which awarded me with a Public Education

23  Service Award for representing the public high school students of California in a challenge to the

24  High School Exit Exam.  I have also received commendations from the California State Senate

25  and the California State Assembly.  I have been honored by the League of United Latin-American

26  Cities, the Mexican-American Political Association, La Raza Centro Legal, and the San

27  Francisco, East Bay, and Fresno La Raza Lawyers' Associations.  Numerous public interest

28  organizations have recognized me for my work affecting the public interest.

3

## THIS LITIGATION

11.   In early 2009, Bullis engaged Morrison & Foerster to analyze the legality of the District's facilities offer and methodology.  Prior to filing this lawsuit, we conducted an extensive analysis of the District's facilities offer, informed the District of all of the ways in which it was deficient, and asked the District to correct those deficiencies.  We hoped that through open dialogue and negotiation, we could avoid litigation.  But the District refused to address the issues Bullis identified.  We had no choice but to file a lawsuit, which we did in June 2009.

12.   This case has been vigorously litigated for over four years.  It was not an easy case to win.  The District has hired multiple law firms to fight Bullis, including the international law firm of Reed Smith.  In addition, multiple parties have filed multiple amici briefs that we have had to address, both in the appellate and trial courts.

## THE DISTRICT'S INACCURATE MEASUREMENTS

13.   From the beginning of this engagement, and throughout the litigation, Bullis' job was particularly difficult due to the numerous steps that the District took that made it difficult to compare the facilities at comparison group schools and those offered to Bullis.  For example:

- The District knowingly used – and filed with the Court – old site plans that overstated the amount of space offered to Bullis.  Attached as **Exhibit A** to my original (August 10, 2012) declaration is a true and correct copy of a declaration (with relevant exhibits only) detailing the District's filing of a declaration from their architect that contained inaccurate measurements of Bullis.  Exhibit A was filed on October 26, 2009, in support of Bullis' petition.  (See Dkt. No. 77.)  Even though the District admitted that the map was wrong, and although the Court of Appeal noted the District's use of the erroneous map and figures, the District continued to use the same outdated map.  (See Supplemental Declaration of Andrea Eyring In Support of Bullis' Motion to Compel Compliance, Dkt. No. 180, ¶¶ 10-11; *Bullis Charter School v. Los Altos School District* (2011) 200 Cal.App.4th 1022, 1057, fn. 24 (*Bullis*).)

4

- The District failed to identify which physical space on each campus it considered in its Proposition 39 analysis, despite Bullis' pre-litigation requests that the District explain the discrepancy between the total site size of each campus and the amount of space reported in the District's Proposition 39 analysis. Instead of identifying which space it did and did not count, the District forced Bullis to painstakingly walk the District's Assistant Superintendent Randy Kenyon through numerous numbered photographs of each school in deposition to determine what the District did and did not count. (*Bullis, supra*, 200 Cal.App. 4th at p. 1045.)

- The District mis-reported actual size of numerous facilities at the comparison group schools, by using "standard room sizes." These were measurements that were not tied to actual (or even average) size of the real facilities. Despite Bullis' multiple requests, the District refused to explain to Bullis how it arrived at its "standard" measurements. Instead, to confirm whether "standard" measurements were accurate, Bullis had to take its own measurements of comparison group schools and conduct detailed analysis of voluminous site maps. It found that the "standard" measurements were wrong. Only then did Mr. Kenyon admit, in deposition, that standard room sizes were invented by the District. (*Bullis, supra*, 200 Cal.App. 4th at pp. 1060-1061.)

- The District counted space at Bullis underneath buildings as "blacktop play space" while also counting the buildings as indoor space, and changed its view of what counted as "blacktop" or "turf" at comparison group schools to make them appear smaller. (*Bullis, supra*, 200 Cal.App. 4th at pp. 1044-1046.)

- The District used inconsistent and shrinking measurements to represent certain areas at comparison group schools, despite the fact that there had been no changes to the configurations or sizes of the comparison group schools. (*Bullis, supra*, 200 Cal.App. 4th at p. 1046.)

5

- The District failed to accurately report (and in some cases, failed to even measure) site size. (*Bullis, supra*, 200 Cal.App. 4th at pp. 1050-1052.) Bullis had to engage various individuals – including an aerial photographer, engineer, and architect/designer – to obtain measurements that the District refused to provide.

- The District failed to report the amount of space per student at comparison group schools. (*Bullis, supra*, 200 Cal.App. 4th at pp. 1050, 1055.) Bullis had to reverse engineer these calculations.

- The District failed to specify the sharing arrangements that would restrict Bullis' use of the facilities offered, and counted restricted use space as if it had been offered on a 100% basis. (*Bullis, supra*, 200 Cal.App. 4th at p. 1059.)

- The District withheld building and site plans from Bullis, despite multiple requests (including requests before litigation began), forcing us to go to the Division of State Architect to obtain these plans.  This took us, and DSA, significant time and effort.  When the District finally allowed us to inspect site plans, months later (and well into litigation), they first directed us to old building and site plans that were clearly irrelevant.  Only after considerable pressure did the District drive us to a completely different location where the relevant documents were stored.

14. In order to demonstrate and explain the District's improper methodology and allocation, we had to spend significant amounts of time reverse engineering and cross-checking the District's process:

- We reviewed volumes of historical documents, including, among others, all documents related to each Proposition 39 offer since Bullis' inception, District budget reports for accurate total site size measurements, demographer's reports, District Board minutes, and documents submitted by the District to Facilities Planning Division of the Department of Education.

6

- We noticed and took the deposition of various District administrators and agents, including Mr. Kenyon (to find the truth about what he did and did not consider in his Proposition 39 analysis and accurate site measurements, among other things) and the District's architect, Lawrence Schadt (to determine whether accurate maps were used to take measurements and what he was instructed to exclude from his measurements).

- We engaged various subject matter experts to, among other things, take aerial photographs, create Auto-CAD files, and determine site size measurements.

15.    Despite these difficulties, Bullis' efforts have resulted in a published opinion that will benefit charter school students throughout the state. (See Declaration of J. Wallace ("Wallace Dec."), filed on August 10, 2012 (see Dkt. No 191); see also Supplemental Declaration of J. Wallace ("Supp. Wallace Dec."), filed concurrently herewith.)

### MY CUSTOMARY HOURLY RATE

16.    One of the factors that courts consider in determining a reasonable hourly rate is the customary rate that is charged by the attorney. In 2009, my customary billing rate was $750 per hour. In 2010, my customary billing rate was $795. In 2011, my customary billing rate was $835. My 2012 customary billing rate was $875. Early in 2012, I tried a case in the Southern District of New York where I billed the client $875 an hour for my time. My current customary billing rate is $950.

17.    Bullis received a 5% discount off of all of our hourly rates from the beginning of this engagement through the end of 2012. The District's tactics (further discussed below) have caused me significant concern about the cost of this litigation. In an effort to stem those costs, I have followed a strict "push work down" to associates policy (also discussed below). I have also increased the discount that the firm has given the client on this engagement. For example, in late 2012, the associate discount increased to 10%, and in January 2013, this discount was applied to all timekeepers (including me). In March 2013, we increased the Bullis discount to 15% for associates and legal assistants.

7

sf-3341220

1    18.    In 2009, my hourly rate to Bullis was $712.50, in 2010 - $755.25, in 2011 -

2    $793.25, in 2012, - $831.25, and in 2013, it is $855.

3                    **TRIAL COURT PREPARATION AND PROCEEDINGS**

4    19.    Preparing to file this case, and briefing in preparation for the hearing on Bullis'

5    petition, was extremely difficult and time-intensive.  That was due, in large part, to the District's

6    failure to properly account for all space at its schools, overstating the amount of space it had

7    allocated to Bullis, and constantly changing factual assertions and legal arguments.  Repeatedly

8    during the course of this litigation, the District's factual and legal positions have changed.  For

9    example, the District has frequently changed its measurements of the comparison group

10   campuses.  At one point, the District filed a declaration from its architect with this Court that the

11   District's lawyers knew contained false statements.  We discussed this in detail in the Opening

12   Brief in the Court of Appeal.  The relevant pages of that discussion are attached as **Exhibit B** to

13   my original (August 10, 2012) declaration.

14   20.    As a result, we have had to reverse engineer almost all of the District's Proposition

15   39 analysis, and upon discovery of numerous and significant errors, take extensive measurements

16   of each comparison group school – indoor and outdoor space, as well as overall site size – and the

17   space allocated to Bullis.  Approximately 14 depositions were taken of parties and non-parties,

18   though Bullis only took 5.

19   21.    The Court of Appeal commented on many of these discrepancies in its opinion.

20   For example, the Court noted that "large amounts (*over 50 percent*) of exterior square footage

21   were not included in the District's calculations." (*Bullis, supra*, 200 Cal.App.4th at p. 1044,

22   emphasis in original.)  The Court also noted that Randy Kenyon, the District's Assistant

23   Superintendent, had failed to count picnic tables, walkways, lunch areas, childcare areas,

24   playgrounds, blacktop, and other space at the comparison group schools. (*Id.* at p. 1045.)  The

25   Court also noted that Kenyon instructed the architect to only measure certain specified areas and

26   "not anything else." (*Id.* at p. 1046, fn. 15.)  Significantly, the Court noted that there was

27   "evidence in the record—e.g., failure to consider large amounts of comparison group school

28   space, disregarding site size component, and changing established methods of performing the

8

1  reasonable equivalence analysis—from which such a finding [of bad faith] could be made." (*Id.*
2  at p. 1063, fn. 35.)

3  　　22.　　In addition, the legal arguments made in the District's Petition for Review conflict
4  with other legal positions advocated by the District in this Court. Here are just a few notable
5  examples from the briefing before this Court pertaining to the Proposed Judgment:

6  　　**Site Size.** Bullis' proposed judgment stated that "[t]he District shall provide Bullis with a
7  site and facilities that are reasonably equivalent to the 10-acre minimum sites enjoyed by
8  comparison schools." (Amended Proposed Judgment at 1.) The District objected to this
9  language on the ground that "[t]he court of appeal decision does not require provision of a
10  specific size site." (Respondents' Objections at 4:6, Dkt. No. 111.) But in the Supreme
11  Court and Court of Appeal the District argued repeatedly that:

12  　　　[Under the Court of Appeal's opinion,] a district ***must*** . . . provide a
13  　　　school site of equal size [to the charter school]. (Pet. for Review at
　　　15, italics added.)

14  　　　[T]he Opinion transforms site size into an overriding consideration,
15  　　　requiring a district to provide a site of equal size [to the charter
　　　school] to those of the comparison school sites. (Pet. for Review at
16  　　　30.)

17  　　　[T]he Court [of Appeal] hails site size as an overriding
　　　consideration. (Pet. for Rehearing at 50.)

18  　　　[The Court of Appeal opinion] elevat[es] . . . 'school site size' to
19  　　　the primary consideration in the analysis. (Req. for Depublication
　　　at 6.)

20  　　　[T]he Opinion elevates site size to *the* overriding factor. (Reply In
21  　　　Support of Pet. for Review at 14.)

22  　　**Allocation of Facilities.** Bullis' proposed judgment also stated that "the District shall
23  consider total site size and account for (and allocate reasonably equivalent building and
24  outdoor space to Bullis for) *all* building and outdoor space on any and all comparison
25  school sites." (Amended Proposed Judgment at 1.) The District objected on the ground
26  that "[t]he court of appeal decision says nothing about what the District needs to allocate –
27  it only opines as to what the District needs to consider." (Respondents' Objections at 5,
28  10.) Compare this to the District's arguments in prior briefs:

9

1    [Under the Court of Appeal's Opinion,] a district *must . . . allocate*
2    'equal' space to the charter school.  (Pet. for Review at 15, italics added.)

3    [U]nder the Opinion, a district *must . . . allocate* each and every
     category of non-teaching space to a charter school."  (Pet. for
4    Review at 22-23, italics added.)

5    [A] district *must* count every facility at every comparison school
     and *provide* each facility to the charter school.  (Reply In Support
6    of Pet. for Review at 13, italics added.)

7    [T]he Opinion indicates that [the] district *must . . . provide*
     additional space or access, to *another* multi-purpose room to meet
8    the 'reasonably equivalent requirement.  (Pet. for Review at 32, italics added.)

9
     The [Court of Appeal] Opinion . . . finds that a school district must
10   include [in its facilities offer] before- and after-school childcare
     facilities if comparison schools also include such facilities.  (Pet.
11   for Rehearing at 49; see also Pet. for Review at 33 [same]; Reply In
     Support of Pet. for Review at 16 [same].)
12

13   **Consideration of All Space.**  Bullis' proposed judgment stated that "[t]he District shall,

14   in its reasonable equivalency analysis, disclose and utilize the actual size of building and

15   outdoor space at comparison schools."  (Amended Proposed Judgment at 1.)  The District

16   objected because"[t]he court of appeal does not dictate how the District shall document its

17   consideration, . . . . Mathematical precision is not required; a fair representation of space

18   may be given in a number of ways."  (Respondents' Objections at 6.)  Likewise, the

19   District objected to measuring all outdoor space, on the ground that "[t]he court of appeal

20   decision does not order the District . . . to measure everything."  (*Id.* at 7.)  The District

21   also objected to proposed language requiring the District to provide accurate

22   measurements of the outdoor and building space offered to Bullis, because "[t]he court of

23   appeal decision . . . does not mandate measuring every single space."  (*Id.* at 8.)

24   Again, the District sang a different song in the Supreme Court and Court of Appeal:

25   [T]he Opinion . . . requires a district to measure *all square feet of
     space* which is not considered 'teaching station space' or
26   'specialized classroom space.'  (Reply In Support of Pet. for
     Review at 12, italics added.)

27

28

10

> [T]he [Court of Appeal] Opinion . . . requires *calculations and
> articulation* of every square inch of space, usable or not. (Pet. for
> Rehearing at 35, italics added.)

> One of the [Court of Appeal] Opinion's *primary holdings requires*
> school districts to include every square foot of a parcel on which a
> school sits in its consideration of a facilities request. (Pet. for
> Rehearing at 42, italics added.)

> [E]very patch of dirt, hillside, space occupied by a cell phone tower
> or space otherwise essentially unusable to students and staff must
> be considered in the analysis. (Pet. for Rehearing at 42.)

> [A] district must . . . meticulously measure *all* space at each
> comparison school site, . . . [and] identify every category of space
> at every comparison school site. (Pet. for Review at 15-16.)

> The Opinion . . . concludes a district must count every category of
> facility at every school site. (Pet. for Review at 29; see also
> Request for Depublication at 6 [same]; Reply In Support of Pet. for
> Review at 13 [same].)

> [T]he Opinion imposes a requirement of 'arithmetical precision.'
> (Reply In Support of Pet. for Review at 11.)

23.    When we appeared before this Court to argue regarding the Proposed Judgment,

the District's lawyers from Reed Smith told this Court (without a clear explanation) to disregard

the District's objections to the Proposed Judgment. Specifically, Ray Cardoza told this Court that

that "[y]ou can consider the objections withdrawn." (A true and correct excerpt from the

transcript of this hearing is attached as **Exhibit C** (see 3:10-11) to my original (August 10, 2012)

declaration.) However, by that point, I had personally spent a significant amount of time

digesting and responding to that brief. At no point prior to Mr. Cardozo making this statement in

open court had I been given notice that the District was going to "withdraw" their written

objections to the Proposed Judgment.

## DELEGATING WORK TO ASSOCIATES AND CLIENTS

24.    In order to more efficiently handle this matter, I delegated significant

responsibilities to the associate working on this case, including covering nearly all of the

depositions, drafting all of the written discovery and submissions to the Court, interviewing

witnesses, and handling conferences and negotiations with opposing counsel.

11

sf-3341220

25.     Suzanna Brickman has been the associate who has assumed primary responsibility for the day-to-day tasks on this case since its inception.  Ms. Brickman is a 2006 graduate from Stanford Law School.  Prior to associating with Morrison & Foerster, Ms. Brickman completed a one-year fellowship in education law at The Johns Hopkins University.  Ms. Brickman has been working with Bullis since 2008, and has worked on this engagement since its inception in 2009.  She drafted the petition and most of the briefs, and drafted most of the written discovery and took or defended many of the depositions.  In 2009, Ms. Brickman's customary billing rate was $400; in 2010, it was $480; in 2011, it was $570; in 2012, it was $620; and it is currently $650.  Despite these customary rates, Morrison & Foerster reduced Ms. Brickman's hourly rate as follows:  $380 in 2009, $456 in 2010, $541.50 in 2011, $589 in 2012 (in late 2012 this was reduced to $558), and $552.50 in 2013.  As discussed above, these rates reflect a 5-15% discount.

26.     In addition to Ms. Brickman, associate Maggie Mayo assisted with this case in April through September 2009.  At the time, Ms. Mayo was a first year associate (she is a 2008 graduate of the University of California, Berkeley, School of Law) and billed at a customary rate of $295 (Bullis was billed $280.25 for her time).  Moreover, several summer associates have conducted legal research and analysis on this matter since 2009 (including research related to this motion and the currently pending motion to compel compliance); most of this work has not been billed to the client.

27.     To further improve efficiency and reduce the number of hours billed by Morrison & Foerster, Bullis Board and committee members have volunteered many hours to case strategy and fact development, as well as negotiations with the District, since the beginning of this litigation.  For example, Andrea Eyring, a six-year Bullis Board member who holds a bachelor and master degree in electrical engineering from Brigham Young University, spent many hours on this litigation.  Ms. Eyring took extensive measurements of all relevant District campuses – including indoor space, outdoor space, and overall site size.  Ms. Eyring also reverse engineered numerous District facilities offers in order to show the District's inconsistent and inaccurate measurements, overstatement of Bullis' measurements, understatement of comparison schools'

1   measurements, and the otherwise obfuscated discrepancy between Bullis' facilities and those of

2   the comparison group schools.

3        28.      Francis La Poll, another Bullis Board member, has also volunteered many hours to

4   this litigation in order to reduce Bullis' fees. Mr. La Poll graduated from Stanford Law School,

5   served as a Ninth Circuit clerk, and is currently an AV-rated lawyer in private practice. Mr. La

6   Poll served as a two-term Mayor of the City of Los Altos. Mr. La Poll was particularly helpful in

7   mediation, where we were able to reach a settlement in principle with the District's negotiating

8   committee.

9        29.      I also delegated significant tasks to my law school classmate, David Spector, who

10  has volunteered many hours to this matter. Mr. Spector is a cum laude graduate of Harvard Law

11  School. He has played an integral role in, among other things, analyzing the District's

12  Proposition 39 methodology, formulating legal strategy, and revising briefs. His work saved

13  Bullis thousands of dollars; without Mr. Spector's assistance, I would have spent considerably

14  more time on this matter.

15       30.      Several other Bullis Board and committee members have dedicated substantial

16  amounts of time to this litigation. Had I not been able to delegate fact development (among other

17  tasks) to them, both Ms. Brickman and I would have had to spend considerably more time on this

18  engagement. Because Ms. Brickman is also responsible for other matters, I would have likely

19  had to put another associate on this case. This would have increased legal fees, especially given

20  the complex facts of this case and the time it takes to getting up to speed. Moreover, I believe we

21  would have had to retain at least two experts to conduct the work that our clients were delegated.

22       31.      I took other measures to ensure that this matter was handled efficiently. For

23  example, Bullis limited the number of depositions it took, and sought expedited briefing on

24  multiple occasions. We also assigned organizational and filings tasks that would ordinarily have

25  been completed by legal assistants to experienced legal secretaries and did not bill for that work.

26              **APPELLATE COURT PREPARATION AND PROCEEDINGS**

27       32.      On appeal, I asked retired Justice Miriam Vogel, who is a Senior Of Counsel at

28  Morrison & Foerster, to assist with briefing. Justice Vogel, a graduate of Whittier Law School,

13

1  spent eighteen years as a Justice on the California Court of Appeal, Second Appellate District,

2  Division One, and five years as a judge on the Los Angeles Superior Court. Justice Vogel is a

3  member of the California Academy of Appellate Lawyers and serves on the Ninth Circuit

4  Advisory Board. Although Justice Vogel's customary rate was $765 in 2010, $800 in 2011, and

5  $850 in 2012, her hourly rate to Bullis was $726.75, $760, and $807.50, respectively.

6  Ms. Brickman also played a large role in preparing the appellate court filings, as did the Bullis

7  volunteers. Again, for the sake of efficiency, I delegated most of the work regarding the appeal to

8  others.

9      33.    Even after the Court of Appeal issued its opinion, we operated with as much

10  efficiency as possible in the face of a concerted effort by the District to set aside the opinion. The

11  District filed three post-appeal briefs: a Petition for Rehearing, Petition for Review, and Reply in

12  Support of Petition for Review. In addition, the District filed a Request for Depublication.

13  Moreover, the California School Boards Association submitted an amicus letter in support of the

14  District's Petition for Review. We successfully opposed the District's efforts to overturn the

15  Court of Appeal's opinion.

16              **POST-APPEAL TRIAL COURT PREPARATION AND PROCEEDINGS**

17      34.    When this was case was remanded to the trial court following remittitur, we took

18  various steps to expedite post-appeal matters and resolution of the litigation. Bullis appeared ex

19  parte 6 court days after remittitur issued and asked the Court to move forward status conference,

20  sign a proposed judgment, and expedite any briefing on the form of judgment. The parties are

21  continuing to litigate whether the District has complied with the Court's order and writ – that

22  motion is currently on appeal.

23      35.    In addition, when Bullis filed this fees motion in August 2012, the District served

24  substantial discovery requests– seeking from Bullis documents and information including: all

25  admission applications Bullis received from 2008-present; Bullis' special education expenses; the

26  occupations of all Bullis parents from 2009 to the present; the average annual income of parents

27  who send their children to Bullis; the net worth of parents who send their children to Bullis;

28  Bullis' recruiting and enrollment materials since 2004; the investment strategy and earnings of the

14

1   independent and non-party Bullis-Purissima Elementary School Foundation; the Los Altos Hills

2   City Counsel's pursuit of a school site; Bullis' legal committee; a group of volunteer parents who

3   looked for a site for Bullis nearly a decade ago; and Bullis' agreements with non-party vendors;

4   and legal bills from other litigation.

5        36.     Since the summer of 2012, the District has served six sets of document requests

6   (84 requests) and five sets of interrogatories (87 interrogatories).  Bullis has responded to each,

7   and has produced nearly a thousand pages of documents.  In addition, we have engaged in

8   countless hours of meet and confer communications and correspondence.

9        37.     In addition to the aforementioned written discovery, the District also took two

10   depositions and served five third party subpoenas, resulting in the production of over 3,200 pages.

11   **SETTLEMENT OF LEGAL FEES AND MEDIATION**

12        38.     We have made several attempts to avoid further litigation and settle the issue of

13   legal fees.  First, I sent the District a letter in early 2012, offering to settle legal fees for an

14   amount substantially less than the fees actually incurred in the course of this litigation.  The

15   District did not respond to the offer.

16        39.     Then, in February 2012, Bullis invited the District to mediation with the intent to

17   reach a long-term solution regarding facilities and to settle outstanding litigation issues, including

18   legal fees.  We attended numerous mediation sessions with the District.  The public details of the

19   mediation with retired Justice Richard J. McAdams are discussed in the Declaration of Ken

20   Moore, filed in support of Bullis' Motion for Compliance.  (Dkt. No. 139.)  Although the parties

21   reached a tentative agreement that included Bullis' waiver of legal fees, the District subsequently

22   refused to adopt the agreed upon deal terms.  (See Exhibits P and Q to the Declaration of Ken

23   Moore in Support of Bullis' Motion for Compliance, Dkt. No. 139.)

24   **IMPACT OF THIS CASE**

25        40.     As discussed in the memorandum of points and authorities and Declaration of Jed

26   Wallace (Dkt. Nos. 189, 191) and the Supplemental Declaration of Jed Wallace, filed

27   concurrently herewith, the Court of Appeal's published opinion reaches far beyond just the

28

parties and provides critical analysis that will guide school districts and charter schools across the
state.

41.     In addition, the impact of this case is evident in light of the publicity it has
received since the Court of Appeal issued its opinion.  For example, the lawsuit was the subject of
legal alerts on various education-related websites, including the websites of the Charter School
Development Center (http://www.chartercenter.org/resources, *last visited* Aug. 9, 2012),
California Charter Schools Association ("CCSA") (Wallace Dec. Ex. A at 1-18), Financial Crisis
& Management Team Assistance (www.fcmat.org/2012/01/20 and www.fcmat.org/2012/01/24,
*last visited* Aug. 9, 2012), and the law firm of Middleton, Young, and Minney
(http://www.mymcharterlaw.com/pdf/Bullis_v_%20Los_Altos_School_District_legal_alert_1028
11_%28PCM%20final%29.pdf, *last visited* Aug. 9, 2012).  As the CCSA noted, this case
represents "[a]n important victory for Prop. 39 statewide . . . . This action by the Court lets stand
the published decision for use throughout the state."  (Wallace Dec. Ex. A at 7.)

42.     Attached as **Exhibit D** to my original (August 10, 2012) declaration are excerpts
from the District's post-appeal briefs in the Court of Appeal and Supreme Court.  We have
highlighted some of the portions of these briefs in which the District concedes that this case is one
that affects broad public interests, and one that will have a significant practical impact on school
districts.

43.     Attached as **Exhibit E** to my original (August 10, 2012) declaration is a
presentation given by Sue Ann S. Evans of Dannis Woliver Kelley, the law firm that represented
the District from the inception of this litigation through the appeal (Ms. Evans was counsel of
record until late February 2012, when her firm was substituted by Reed Smith).[2]  In the
presentation (which was given on March 29, 2012 at the Small School Districts' Association
Annual Conference), the District's own lawyer acknowledged the broad impact of this case.  (Ex.
E at 38 [among other things, noting that under *Bullis* "[a] district must include all square footage

_____

[2] We found this presentation on the Small School Districts' Association's website (*last
visited* Aug. 9, 2012).

of comparison school sites when determining the facilities offered" and that the Court of Appeal "[i]n measuring the facilities a district may not count the entire square footage of a facility if the charter school is sharing that facility with a district-operated school"].)

44.     In addition, the appellate court's decision in *Bullis* is agendized as a "hot topic" to be discussed at the California Council of School Attorneys 2012 Fall Workshop. A true and correct copy of the webpage describing the 2012 Fall Workshop is attached as **Exhibit F** to my original (August 10, 2012) declaration. "The California Council of School Attorneys (CCSA) is . . . comprised of attorneys who represent school districts in California. . . . It is affiliated with the California School Boards Association." (See www.csba.org/LegislationAndLegal/Legal/CaliforniaCouncilOfSchoolAttorneys.aspx, *last visited* Aug. 7, 2012.) This is the same organization that submitted an amicus letter to the Supreme Court in support of the District's Petition for Review, and has now filed an application to appear as amicus curiae in the trial court.

45.     Based on my associate's research, I understand that the Court of Appeal's opinion has been subsequently cited in several cases and legal briefs, and is cited in numerous secondary source materials regarding education, mandamus, standard of review, mootness, and agency discretion. Moreover, the lawsuit has also been the subject of press coverage from various news sources, including those outside the immediate Los Altos vicinity. The case was recently cited in a Howard Law Journal Note and Comment calling for a legislative and judicial remedy for inadequate school facilities.

### HOURS WORKED ON THIS ENGAGEMENT

46.     Attached as **Exhibit G** to my original (August 10, 2012) declaration is a copy of the hourly billings submitted to Bullis from the beginning of this litigation through July 2012 (the last billing submitted before Bullis filed its fees motion). In my professional judgment, all of the time included in Exhibit G was reasonably necessary to litigate this case successfully on behalf of Bullis.[3]

---

[3] We have redacted a few entries that disclose privileged information or that concern issues for which we are not seeking fees.

sf-3341220

1      47.    Attached hereto as **Exhibit G-2** is a copy of the hourly billings submitted to Bullis

2  from August 2012 (when Bullis filed its fees motion) through the present.  These bills have been

3  redacted to exclude work on matters for which we are not currently seeking fees (e.g. appellate

4  work).  In addition, where a particular entry shows that a timekeeper worked on multiple issues,

5  including matters related to this fees motion, we redacted the *entire* entry and are not seeking

6  such fees at this time.  Thus, by way of example, in August 2012, Bullis was billed $176,912.50;

7  however, we are only seeking $11,290.76.  Likewise, in October 2012, Bullis was billed

8  $76,758.75, but we are only seeking $1,674 of that amount.  And in April 2013, Bullis was billed

9  $133,931.25; we are only seeking $23,641.66.  In total, Bullis is seeking $182,252.74 for this

10  firm's work from August 2012 through the end of September 2013.

11      48.    In order to further reduce costs, we delegated a significant amount of discovery to

12  our co-counsel at Procopio, Cory, Hargreaves & Savitch LLP.  The billings reflecting work co-

13  counsel did relating to fees' motion discovery are attached to the Declaration of John Lemmo,

14  submitted concurrently herewith.

15                    **COMPARABLE RATES IN THE SAN FRANCISCO BAY AREA**

16      49.    I am a former member of Morrison & Foerster's Board of Directors and participate

17  in weekly meetings of the Firm's Executive and Management Committees.  I am generally

18  familiar with the hourly rates charged by comparable law firms in San Francisco, Oakland, and

19  Silicon Valley.  Our Firm studies rates charged by comparable law firms to ensure that our rates

20  are competitive.  I have also reviewed fee petitions filed by other law firms and have reviewed

21  cases awarding legal fees in other cases.  The rates that we are seeking in this fee petition are

22  consistent with what comparable attorneys charge in the Bay Area.

23

24

25

26

27

28

18

**FEES SOUGHT**

50.     When we sought fees in August 2012, in addition to the 5% discount Bullis was given, we sought to recover only 95% of the fees it paid to Morrison & Foerster.  Accordingly, the District was asked to pay for only 90% of the work done by Bullis' lawyers.  As discussed above, the fees we have added since our filing reflect a discount of up to 15%.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed this 18th day of October at San Francisco, California.

Arturo J. González

ARTURO J. GONZÁLEZ SUPPL DECL. IN SUPPORT OF MOTION FOR ATTORNEYS' FEES

sf-3341220